## WEATHERFORD, AGENT OF THE SOUTH CAROLINA LAW ENFORCEMENT DIVISION, ET AL. v. BURSEY

No. 75–1510.   Argued December 7, 1976—Decided February 22, 1977

*J. C. Coleman,* Deputy Attorney General of South Carolina, argued the cause for petitioners.   With him on the brief were *Daniel R. McLeod,* Attorney General, and *A. Camden Lewis* and *John L. Choate,* Assistant Attorneys General.

*Laughlin McDonald* argued the cause for respondent.   With him on the brief were *Neil Bradley, Herbert E. Buhl III, Ray P. McClain, Melvin L. Wulf,* and *John H. F. Shattuck.*

*Deputy Solicitor General Frey* argued the cause for the

United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Bork, Assistant Attorney General Thornburgh,* and *Marc Philip Richman.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue here is whether in the circumstances present in this case the conduct of an undercover agent for a state law enforcement agency deprived respondent Bursey of his right to the effective assistance of counsel guaranteed him by the Sixth and Fourteenth Amendments of the United States Constitution or deprived him of due process of law in violation of the Fourteenth Amendment.

## I

This case began when respondent Bursey filed suit under 42 U. S. C. § 1983 against petitioners Weatherford and Strom, respectively an undercover agent for and the head of the South Carolina State Law Enforcement Division, asserting that the defendants had deprived him of certain constitutional rights. The case was tried without a jury. The following facts are taken from the District Court's findings, which were not disturbed by the Court of Appeals.

During the early morning hours of March 20, 1970, Bursey and Weatherford, along with two others, vandalized the offices of the Richland County Selective Service in Columbia, S. C. Police were advised of the incident by Weatherford, who, in order to maintain his undercover status and his capability of working on other current matters in that capacity, was arrested and charged along with Bursey. Weatherford was immediately released on bond and, continuing the masquerade, retained an attorney, Frank Taylor, Sr. Bursey, who was later released on bond, retained his own counsel, C. Rauch Wise.

On two occasions thereafter and prior to trial, Weatherford met with Bursey and Wise, and the approaching trial

was discussed. With respect to these meetings, the District Court found as follows:

"On neither of these occasions did the defendant Weatherford seek information from the plaintiff or his attorney, and on neither occasion did he initiate or ask for the meeting. He was brought into the meetings by the plaintiff and plaintiff's attorney in an effort to obtain information, ideas or suggestions as to the plaintiff's defense. From the beginning Weatherford advised plaintiff and plaintiff's attorney that Weatherford would obtain a severance of his case from that of the plaintiff. This severance was to be upon the ground that Weatherford might be prejudiced in going to trial with Bursey as a codefendant, because of Bursey's reputation and participation in other activities which had been covered by the news media. On no occasion did Bursey or his attorney question the granting of a severance, nor did they seem to concern themselves with whether the prosecutor would consent to a severance, although such consent is quite unusual where codefendants are charged with the same crime and proof will be from the same witnesses based upon identical facts. At those meetings between plaintiff, plaintiff's attorney and defendant Weatherford the plaintiff and his attorney raised the question of a possible informer being used to prove the case, but they never asked Weatherford if he were an informer and he never specifically denied being an informer, since he was never asked or accused." App. 248–249.

At no time did Weatherford discuss with or pass on to his superiors or to the prosecuting attorney or any of the attorney's staff "any details or information regarding the plaintiff's trial plans, strategy, or anything having to do with the criminal action pending against plaintiff." *Id.*, at 249. Until the

day of trial the prosecuting attorney did not plan to use Weatherford as a witness. Consequently, until then, Weatherford had not expected to be a witness and had anticipated continuing his undercover work. However, Weatherford had lost some of his effectiveness as an agent in the weeks preceding trial because he had been seen in the company of police officers, and he was called for the prosecution. He testified as to his undercover activities and gave an eyewitness account of the events of March 20, 1970. Bursey took the stand, was convicted, and then disappeared until apprehended some two years later, at which time he was incarcerated and forced to serve his 18-month sentence.

Bursey then began this § 1983 action, alleging that Weatherford had communicated to his superiors and prosecuting officials the defense strategies and plans which he had learned at his meetings with Bursey and Wise, thereby depriving Bursey of the effective assistance of counsel to which he was entitled under the Sixth and Fourteenth Amendments as well as of his right to a fair trial guaranteed him by the Due Process Clause of the Fourteenth Amendment. The District Court found for the defendants in all respects and entered judgment accordingly.

The Court of Appeals for the Fourth Circuit reversed, 528 F. 2d 483 (1975), concluding that "on the facts as found by the district court Bursey's rights to effective assistance of counsel and a fair trial were violated." *Id.*, at 486. The Court of Appeals held that "whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial." *Ibid.* That the intrusion occurred in order to prevent revealing Weatherford's identity as an undercover agent was immaterial. The Court of Appeals thought that Weatherford was himself "a member of the prosecution," *id.*, at 487, and that therefore it was also immaterial that he had not informed other

officials about what was said or done in the two meetings with Bursey and Wise.

In addition, the Court of Appeals concluded that Bursey had been denied due process of law under *Brady* v. *Maryland,* 373 U. S. 83 (1963), by concealment of Weatherford's identity until the day of trial and by Weatherford's statement that he would not be a witness, all of which lulled Bursey into a false sense of security and interfered with his preparations for trial. The judgment of the District Court was reversed, but the remand for further proceedings would have allowed Weatherford and Strom to present a qualified immunity defense under *Wood* v. *Strickland,* 420 U. S. 308 (1975).

We granted the petition for certiorari filed by Weatherford and Strom, who are represented by the State Attorney General. 426 U. S. 946 (1976). We reverse.

## II

The exact contours of the Court of Appeals' *per se* right-to-counsel rule are difficult to discern; but as the Court of Appeals applied the rule in this case, it would appear that if an undercover agent meets with a criminal defendant who is awaiting trial and with his attorney and if the forthcoming trial is discussed without the agent's revealing his identity, a violation of the defendant's constitutional rights has occurred, whatever was the purpose of the agent in attending the meeting, whether or not he reported on the meeting to his superiors, and whether or not any specific prejudice to the defendant's preparation for or conduct of the trial is demonstrated or otherwise threatened. The Court of Appeals was of the view, 528 F. 2d, at 486, that this Court "establish[ed] such a per se rule" in *Black* v. *United States,* 385 U. S. 26 (1966), and *O'Brien* v. *United States,* 386 U. S. 345 (1967). The Court of Appeals also relied on *Hoffa* v. *United States,* 385 U. S. 293 (1966).

We cannot agree that these cases, individually or together, either require or suggest the rule announced by the Court of Appeals and now urged by Bursey. Both *Black* and *O'Brien* involved surreptitious electronic surveillance by the Government, which was discovered after trial and conviction and which was plainly illegal under the Fourth Amendment.[1] In each case, some, but not all, of the conversations overheard were between the criminal defendant and his counsel during trial preparation. The conviction in each case was set aside and a new trial ordered. The explanatory *per curiam* in *Black,* although referring to the overheard conversations with counsel, did not rule that whenever conversations with counsel are overheard the Sixth Amendment is violated and a new trial must be had. Indeed, neither the Sixth Amendment nor the right to counsel was even mentioned in the short opinion. The Solicitor General conceded that Black was entitled to a "judicial determination" of whether "the monitoring of conversations between [Black] and his attorney had [any] *effect* upon his conviction or the fairness of his trial," although the Solicitor General contended that information derived from the overheard conversations was not used in any way by the prosecution. Memorandum for United States in *Black* v. *United States,* O. T. 1965, No. 1029, p. 4 (emphasis added). The Court focused on the particular form the "judicial determination"

---

[1] In *Silverman* v. *United States,* 365 U. S. 505 (1961), the Court had held that eavesdropping accomplished through use of an electronic listening device similar to the "tubular microphone" used to overhear Black's and O'Brien's conversations constituted an unauthorized physical penetration of the petitioners' premises in violation of the Fourth Amendment. The Solicitor General conceded that both Black and O'Brien should have been allowed to establish that the prosecution's case was tainted by the interception of conversations between Black and persons other than their attorneys as well as by conversations involving counsel, thus indicating his awareness of the illegality of the Government's eavesdropping under the Fourth Amendment.

should take, concluding that on the particular facts of the case a new trial was the more appropriate means of affording Black "an opportunity to protect himself from the *use* of evidence that might be otherwise inadmissible." 385 U. S., at 29 (emphasis added). In *O'Brien,* the Court wrote nothing further, merely citing the *Black per curiam.* Once again the Solicitor General did not oppose further judicial proceedings to determine whether any information from the surveillance had been used at trial, notwithstanding his assertion that the contents of the overheard conversations were never communicated to the prosecuting attorneys. Brief for United States in *O'Brien* v. *United States,* O. T. 1966, No. 823, pp. 10–12.

It is difficult to believe that the Court in *Black* and *O'Brien* was evolving a definitive construction of the Sixth Amendment without identifying the Amendment it was interpreting, especially in view of the well-established Fourth Amendment grounds for excluding the fruits of the illegal surveillance.[2] If anything is to be inferred from these two cases with respect to the right to counsel, it is that when conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial. This is a far cry from the *per se* rule announced by the Court of Appeals below, for under that rule trial prejudice to the defendant is deemed irrelevant. Here, the courts below have already conducted the "judicial determination," lacking in *Black* and *O'Brien,* of the effect of the overheard conversations on the defendant's conviction, and there is nothing in their findings or in the record to indicate any "use of evidence that might be otherwise inadmissible."

Neither does the Court's decision in *Hoffa* v. *United States, supra,* support the proposition urged by respondent. There, an informant sat in on conversations that defendant Hoffa had with his lawyers and with others during the

---

[2] See n. 1, *supra.*

course of Hoffa's trial on a charge of violating the Taft-Hartley Act. The jury at that trial hung. Hoffa was then tried for tampering with that jury. The informer testified at the latter trial with respect to conversations he had overheard in Hoffa's hotel suite during the prior trial, not including, however, the conversations Hoffa had with counsel. The Court sustained Hoffa's jury-tampering conviction over his claim, among others, that his Sixth Amendment counsel right had been violated.

In doing so, the Court did not hold that the Sixth Amendment right to counsel subsumes a right to be free from intrusion by informers into counsel-client consultations. Nor did it purport to describe the contours of any such right. The Court merely *assumed*, without deciding, that two cases in the Court of Appeals for the District of Columbia Circuit dealing with the right to counsel, *Caldwell* v. *United States*, 92 U. S. App. D. C. 355, 205 F. 2d 879 (1953), and *Coplon* v. *United States*, 89 U. S. App. D. C. 103, 191 F. 2d 749 (1951), were correctly decided; [3] *assumed* without deciding, that had Hoffa been convicted at his first trial, the conviction would have been set aside because the informer had overheard Hoffa and his lawyers conversing and had reported to the authorities the substance of at least some of those conversations; and then held that Hoffa's *assumed* Sixth Amendment rights had not been violated because the informer's testimony at the jury-tampering trial did not touch upon the overheard conversations with counsel but dealt only with conversations between Hoffa and third parties when his lawyers were not

---

[3] *Coplon* held that interceptions by Government agents of telephone messages between the defendant and her lawyer before and during trial, if proved by the defendant, deprived her of her right to counsel and entitled her to a new trial. *Caldwell* held that the defendant's right to counsel was violated where a Government undercover agent went to work as an assistant for the defense and reported frequently to the prosecution on "many matters connected with the impending trial." 92 U. S. App. D. C., at 356, 205 F. 2d, at 880 (footnote omitted).

present. 385 U. S., at 307–308. Neither *Black, O'Brien, Hoffa,* nor any other case in this Court to which we have been cited furnishes grounds for the interpretation and application of the Sixth and Fourteenth Amendments appearing in the Court of Appeals' opinion and judgment.

At the same time, we need not agree with petitioners that whenever a defendant converses with his counsel in the presence of a third party thought to be a confederate and ally, the defendant assumes the risk and cannot complain if the third party turns out to be an informer for the government who has reported on the conversations to the prosecution and who testifies about them at the defendant's trial. Had Weatherford testified at Bursey's trial as to the conversation between Bursey and Wise; had any of the State's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey-Wise conversations about trial preparations, Bursey would have a much stronger case.[4]

---

[4] In *Hoffa,* the United States conceded, as it does here as *amicus curiae,* that the Sixth Amendment would be violated "if the government places an informant in the defense camp during a criminal trial and receives from that informant privileged information pertaining to the defense of the criminal charges . . . because the Sixth Amendment's assistance-of-counsel guarantee can be meaningfully implemented only if a criminal defendant knows that his communications with his attorney are private and that his lawful preparations for trial are secure against intrusion by the government, his adversary in the criminal proceeding." Brief for United States in *Hoffa* v. *United States,* O. T. 1966, No. 32, p. 71, quoted in Brief for United States as *Amicus Curiae* in the instant case, p. 24 n. 13.

Respondent argues that *Hoffa* established the same right-to-counsel standard for government interception of attorney-client communications by an undercover agent as for interception by electronic surveillance. Even apart from the fact that the Court was merely assuming the existence of a right-to-counsel violation in that case, see *supra,* at 553, we find respondent's argument questionable. One threat to the effective assist-

None of these elements is present here, however. Weatherford's testimony for the prosecution about the events of March and April 1970 revealed nothing said or done at the meetings between Bursey and Wise that he attended.[5] None of the State's evidence was obtained as a consequence of Weatherford's participation in those meetings. Nevertheless, it

ance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard. However, a fear that some third party may turn out to be a government agent will inhibit attorney-client communication to a lesser degree than the fear that the government is monitoring those communications through electronic eavesdropping, because the former intrusion may be avoided by excluding third parties from defense meetings or refraining from divulging defense strategy when third parties are present at those meetings. Of course, in some circumstances the ability to exclude third parties from defense meetings may not eliminate the chilling effect on attorney-client exchanges, but neither *Hoffa* nor any other decision of this Court supports respondent's theory that the chill is the same whether induced by electronic surveillance or by undercover agents. Cf. *Fisher* v. *United States,* 425 U. S. 391, 402–405 (1976) (attorney-client privilege protects only those disclosures which might not have been made absent the privilege, because the purpose of the privilege is to encourage confidential disclosures by a client to an attorney); 8 J. Wigmore, Evidence § 2311, pp. 601–602 (McNaughton rev. ed. 1961) (attorney-client communications in the presence of a third party not the agent of either are generally not protected by the privilege).

[5] See App. 225–240 (testimony of Weatherford at state trial). On cross-examination by Wise (Bursey's lawyer), Weatherford acknowledged that at the second meeting with Bursey and Wise, Weatherford told Wise, in response to the latter's questions, that he had not been asked to testify for the prosecution and that he did not anticipate being present at Bursey's trial. This testimony, elicited by defense counsel apparently for the purpose of discrediting Weatherford's testimony on direct examination, obviously does not constitute use by the prosecution of information obtained from Weatherford's attendance at defense meetings. Whatever the limitations on testimony by informants about statements made at defense meetings attended by them, the Sixth Amendment does not prevent the defense from introducing such statements to undercut the effectiveness of the informant's testimony for the prosecution.

might be argued that Weatherford, a dutiful agent, surely communicated to the prosecutors Bursey's defense plans and strategy and his attorney's efforts to prepare for trial, all of which was inherently detrimental to Bursey, unfairly advantaged the prosecution, and threatened to subvert the adversary system of criminal justice.

The argument founders on the District Court's express finding that Weatherford communicated nothing at all to his superiors or to the prosecution about Bursey's trial plans or about the upcoming trial. App. 249, 252. The Court of Appeals did not disturb this finding, but sought to surmount it by declaring Weatherford himself to have been a member of the prosecuting team whose knowledge of Bursey's trial plans was alone enough to violate Bursey's constitutional right to counsel and to vitiate Bursey's conviction. 528 F. 2d, at 487. Though imaginative, this reasoning is not a realistic assessment of the relationship of Weatherford to the prosecuting staff or of the potential for detriment to Bursey or benefit to the State that Weatherford's uncommunicated knowledge might pose. If the fact was, as found by the District Court, that Weatherford communicated nothing about the two meetings to anyone else, we are quite unconvinced that a constitutional claim under the Sixth and Fourteenth Amendments was made out.

This is consistent with the Court's approach in the *Hoffa* case. There, the informant overheard several conversations between Hoffa and his attorneys, but the Court found it necessary to deal with the Sixth Amendment right-to-counsel claim only after noting that the informant had reported to the Government about at least some of the activities of Hoffa's defense counsel. 385 U. S., at 305–306. As long as the information possessed by Weatherford remained uncommunicated, he posed no substantial threat to Bursey's Sixth Amendment rights. Nor do we believe that federal or state prosecutors will be so prone to lie or the difficulties of proof

will be so great that we must always assume not only that an informant communicates what he learns from an encounter with the defendant and his counsel but also that what he communicates has the potential for detriment to the defendant or benefit to the prosecutor's case.

Moreover, this is not a situation where the State's purpose was to learn what it could about the defendant's defense plans and the informant was instructed to intrude on the lawyer-client relationship or where the informant has assumed for himself that task and acted accordingly. Weatherford, the District Court found, did not intrude at all; he was invited to the meeting, apparently not for his benefit but for the benefit of Bursey and his lawyer. App. 248. Weatherford went, not to spy, but because he was asked and because the State was interested in retaining his undercover services on other matters and it was therefore necessary to avoid raising the suspicion that he was in fact the informant whose existence Bursey and Wise already suspected.

That the *per se* rule adopted by the Court of Appeals would operate prophylactically and effectively is very likely true; but it would require the informant to refuse to participate in attorney-client meetings, even though invited, and thus for all practical purposes to unmask himself. Our cases, however, have recognized the unfortunate necessity of undercover work and the value it often is to effective law enforcement. *E. g., United States* v. *Russell,* 411 U. S. 423, 432 (1973); *Lewis* v. *United States,* 385 U. S. 206, 208–209 (1966). We have also recognized the desirability and legality of continued secrecy even after arrest. *Roviaro* v. *United States,* 353 U. S. 53, 59, 62 (1957). We have no general oversight authority with respect to state police investigations. We may disapprove an investigatory practice only if it violates the Constitution; and judged in this light, the Court of Appeals' *per se* rule cuts much too broadly. If, for example,

Weatherford at Bursey's invitation had attended a meeting between Bursey and Wise but Wise had become suspicious and the conversation was confined to the weather or other harmless subjects, the Court of Appeals' rule, literally read, would cloud Bursey's subsequent conviction, although there would have been no constitutional violation. The same would have been true if Wise had merely asked whether Weatherford was an informant, Weatherford had denied it, and the meeting then had ended; likewise if the entire conversation had consisted of Wise's questions and Weatherford's answers about Weatherford's own defense plans. Also, and more cogently for present purposes, unless Weatherford communicated the substance of the Bursey-Wise conversations and thereby created at least a realistic possibility of injury to Bursey or benefit to the State, there can be no Sixth Amendment violation. Yet under the Court of Appeals' rule, Bursey's conviction would have been set aside on appeal.

There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment. The proof in this case thus fell short of making out a § 1983 claim, and the judgment of the District Court should have been affirmed in this respect.

It is also apparent that neither Weatherford's trial testimony nor the fact of his testifying added anything to the Sixth Amendment claim. Weatherford's testimony for the prosecution related only to events prior to the meetings with Wise and Bursey and referred to nothing that was said at those meetings. There is no indication that any of this testimony was prompted by or was the product of those meetings. Weatherford's testimony was surely very damaging, but the mere fact that he had met with Bursey and his lawyer prior to trial did not violate Bursey's right to

counsel any more than the informant's meetings with Hoffa and Hoffa's lawyers rendered inadmissible the informant's testimony having no connection with those conversations.

## III

Because under *Brady* v. *Maryland,* 373 U. S. 83 (1963), the prosecution has the "duty under the due process clause to insure that 'criminal trials are fair' by disclosing evidence favorable to the defendant upon request," the Court of Appeals also held that the State was constitutionally forbidden to "conceal the identity of an informant from a defendant during his trial preparation," to permit the informant to "deny up through the day before his appearance at trial that he will testify against the defendant," and then to have the informant "testify with devastating effect." 528 F. 2d, at 487. This conduct, the Court of Appeals thought, lulled the defendant into a false sense of security and denied him "the opportunity (1) to consider whether plea bargaining might be the best course, (2) to do a background check on Weatherford for purposes of cross-examination, and (3) to attempt to counter the devastating impact of eyewitness identification." *Ibid.* The Court of Appeals apparently would have arrived at this conclusion whether or not Weatherford had ever met with Wise.

Again we are in disagreement. *Brady* does not warrant the Court of Appeals' holding. It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably. There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one; as the Court wrote recently, "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded . . . ." *Wardius* v. *Oregon,* 412 U. S. 470, 474 (1973). *Brady* is not implicated here where the only claim is that the State should

have revealed that it would present the eyewitness testimony of a particular agent against the defendant at trial.

In terms of the defendant's right to a fair trial, the situation is not changed materially by the additional element relied upon by the Court of Appeals, namely, that Weatherford not only concealed his identity but represented he would not be a witness for the prosecution, an assertion that proved to be inaccurate. There are several answers to the contention that the claim of misrepresentation is of crucial importance. The first is that there was no deliberate misrepresentation in this regard: The trial court found that until the day of trial Weatherford did not expect to be called as a witness; until then he did not know- that he would testify. Second, as we understand the argument, it is that once the undercover agent has successfully caused an arrest, he risks causing an unfair trial if he denies his identity when accused or asked. We would' hesitate so to construe the Due Process Clause. We are not at all convinced that there is a constitutional difference between the situation where the informant is sufficiently trusted that he is never suspected and never asked about the possibility of his testifying but nevertheless surprises the defendant by giving devastating testimony, and the situation we have here, where the defendant is suspicious enough to ask and the informant denies that he will testify but nevertheless does so. Moreover, if the informant must confess his identity when confronted by an arrested defendant, in many cases the agent in order to protect himself will simply disappear pending trial, before the confrontation occurs. In the last analysis, however, the undercover agent who stays in place and continues his deception merely retains the capacity to surprise; and unless the surprise witness or unexpected evidence is, without more, a denial of constitutional rights, Bursey was not denied a fair trial.

The Court of Appeals suggested that Weatherford's continued duplicity lost Bursey the opportunity to plea bargain.

But there is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial. It is a novel argument that constitutional rights are infringed by trying the defendant rather than accepting his plea of guilty. Moreover, Wise could have approached the prosecutor before trial and surely was under no misapprehension about Bursey's plight during trial. It was also suggested by the Court of Appeals that Bursey was deprived of the opportunity to investigate Weatherford in preparation for possible impeachment on cross-examination. But there was no objection at trial to Weatherford's testimony, no request for a continuance, and even now no indication of substantial prejudice from this occurrence. As for Bursey's claimed disability to counter Weatherford's "devastating" testimony, the disadvantage was no more than exists in any case where the State presents very damaging evidence that was not anticipated. Wise and Bursey must have realized that in going to trial the State was confident of conviction and that if any exculpatory evidence or possible defenses existed it would be extremely wise to have them available. Prudence would have counseled at least as much.

The judgment of the Court of Appeals is

*Reversed.*[6]

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

It is easy to minimize the significance of the incursion into the lawyer-client relationship that the Court sanctions today. After all, as the Court observes, there is no evidence that Weatherford went to the meetings between Bursey and his lawyer with an intent to spy; that he reported to the prosecu-

---

[6] Because we hold that Bursey's constitutional rights were not violated by Weatherford's actions, we reverse the holding of the Court of Appeals that Weatherford's superior, Strom, was also liable because of his involvement in Weatherford's undercover activities.

tor on those meetings; or that what he learned was used to develop evidence against Bursey. But while what occurred here may be "the obnoxious thing in its mildest and least repulsive form . . . illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure." *Boyd* v. *United States,* 116 U. S. 616, 635 (1886). I cannot join in providing even the narrowest of openings to the practice of spying upon attorney-client communications.

There are actually two independent constitutional values that are jeopardized by governmental intrusions into private communications between defendants and their lawyers. First, the integrity of the adversary system and the fairness of trials is undermined when the prosecution surreptitiously acquires information concerning the defense strategy and evidence (or lack of it), the defendant, or the defense counsel. In *Wardius* v. *Oregon,* 412 U. S. 470 (1973), this Court made clear that while "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded . . . it does speak to the balance of forces between the accused and his accuser." *Id.,* at 474. Due process requires that discovery "be a two-way street."

> "The State may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses. It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State." *Id.,* at 475–476.

At issue in *Wardius* was a statute compelling defendants to provide certain information about their case to the prosecution. But the same concerns are implicated when the State seeks such information, not by force of law, but by surreptitious invasions and deceit.

Of equal concern, governmental incursions into confidential lawyer-client communications threaten criminal defendants' right to the effective assistance of counsel. Only last Term we held that the right to counsel encompasses the right to confer with one's lawyer. *Geders* v. *United States,* 425 U. S. 80 (1976). See also *Reynolds* v. *Cochran,* 365 U. S. 525, 531 (1961); *Hawk* v. *Olson,* 326 U. S. 271, 278 (1945); *Avery* v. *Alabama,* 308 U. S. 444, 446 (1940); *Powell* v. *Alabama,* 287 U. S. 45, 57 (1932). But "[a]s a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice." *Fisher* v. *United States,* 425 U. S. 391, 403 (1976). See also *United States* v. *Nobles,* 422 U. S. 225, 238–239 (1975). For this reason, it has long been recognized that "the essence of the Sixth Amendment right is . . . privacy of communication with counsel." *United States* v. *Rosner,* 485 F. 2d 1213, 1224 (CA2 1973), cert. denied, 417 U. S. 950 (1974). See, e. g., *Caldwell* v. *United States,* 92 U. S. App. D. C. 355, 205 F. 2d 879 (1953); *Coplon* v. *United States,* 89 U. S. App. D. C. 103, 191 F. 2d 749 (1951); *Louie Yung* v. *Coleman,* 5 F. Supp. 702, 703 (Idaho 1934); cf., e. g., *In re Rider,* 50 Cal. App. 797, 195 P. 965 (1920); *Thomas* v. *Mills,* 117 Ohio St. 114, 157 N. E. 488 (1927); *State ex rel. Tucker* v. *Davis,* 9 Okla. Crim. 94, 130 P. 962 (1913); *Turner* v. *State,* 91 Tex. Crim. 627, 241 S. W. 162 (1922); Annot., 5 A. L. R. 3d 1360 (1966).

The Court today apparently concludes that neither of these constitutional values is infringed when, as here, the State does not act with a purpose to intercept information about the defense, and the information that is uncovered is neither transmitted to the prosecutor nor used by him to the defendant's detriment. I respectfully disagree. In my view,

the "balance of forces between the accused and his accuser" is sharply skewed in favor of the accuser if the government's key witnesses are permitted to discover the defense strategy by intercepting attorney-client communications, even if the witnesses cannot divulge the information to the prosecution. With this information, the witnesses are in a position to formulate in advance answers to anticipated questions, and even to shade their testimony to meet expected defenses.[1] Furthermore, because of these dangers defendants may be deterred from exercising their right to communicate candidly with their lawyers if government witnesses can intrude upon the lawyer-client relationship with impunity so long as they do not discuss what they learn with the prosecutor.[2] And insofar as the Sixth Amendment establishes an independent right to confidential communications with a lawyer, that right by definition is invaded when a government agent attends meetings of the defense team at which defense plans are reviewed.[3]

---

[1] If, for example, Weatherford had learned that Bursey would use an entrapment defense against whoever admitted to being a government agent, Weatherford could have planned his testimony so as to minimize his own role and emphasize Bursey's predisposition. Bursey, on the other hand, would have had little time to reconstruct in his mind Weatherford's role in the decision to commit the crime once Weatherford testified that he was the state agent. Cf. *United States* v. *Orman,* 417 F. Supp. 1126, 1137 (Colo. 1976).

[2] The Court suggests, *ante,* at 555 n. 4, that defendants can protect themselves against intrusions by third parties by excluding them from meetings at which defense strategy is discussed. But when, as here, the third party is an indicted codefendant, exclusion is not practicable; codefendants need to be informed of each other's strategy if only to determine whether joinder is prejudicial, cf. Fed. Rule Crim. Proc. 14. Indeed, because of the interdependence of codefendants, communications between a lawyer and his client generally remain privileged even when disclosed to a codefendant or his attorney. See The Attorney-Client Privilege in Multiple Party Situations, 8 Colum. J. Law & Soc. Problems 179 (1972).

[3] Of course, the fact that Weatherford did not reveal what he learned

But even if I were to agree that unintended and undisclosed interceptions by government witness-employees affect neither the fairness of trials nor the effectiveness of defense counsel, I still could not join in upholding the practice. For in my view, the precious constitutional rights at stake here, like other constitutional rights, need "breathing space to survive," *NAACP* v. *Button,* 371 U. S. 415, 433 (1963), and a prophylactic prohibition on all intrusions of this sort is therefore essential. A rule that offers defendants relief only when they can prove "intent" or "disclosure" is, I fear, little better than no rule at all. Establishing that a desire to intercept confidential communications was a factor in a State's decision to keep an agent under cover will seldom be possible, since the State always can argue plausibly that its sole purpose was to continue to enjoy the legitimate services of the undercover agent. . Proving that an informer reported to the prosecution on defense strategy will be equally difficult, not only because such proof requires an informer or prosecutor to admit his own wrongdoing (and open the door to damages suits and attacks on convictions), but also because an informer's failure to make a report after overhearing a lawyer-client session oftentimes can be an effective means of communicating to the prosecutor that nothing surprising was uncovered.[4] Given these problems of proof, the only way to assure that defendants will feel free to communicate candidly with their lawyers is to prohibit the government from intercepting such

---

may be relevant to the amount of damages Bursey can recover, as the Court of Appeals acknowledged. 528 F. 2d 483, 487 (CA4 1975). No damages assessment has been made in this case, however, since the District Court found no liability.

[4] In this case, for example, the prosecutor might have assumed that Weatherford had been privy to Bursey's defense plans, and that Weatherford's acquiescence when told of the prosecutor's decision to use him as a witness meant that the defense did not suspect Weatherford or have any damaging information about him.

confidential communications, at least absent a compelling justification for doing so.[5]

Like the Court of Appeals, and unlike the majority today, I believe a *per se* rule of this sort is fully supported, if not compelled, by our decisions in *Black* v. *United States,* 385 U. S. 26 (1966), and *O'Brien* v. *United States,* 386 U. S. 345 (1967). In both cases, the United States informed this Court that lawyer-client conversations had been intercepted by surveillance devices installed to investigate crimes unrelated to the crimes for which the defendants were convicted. Memorandum for United States in *Black* v. *United States,* O. T. 1965, No. 1029, p. 2; Brief for United States in *O'Brien* v. *United States,* O. T. 1966, No. 823, pp. 10–11. In *Black* the Government reported that information uncovered through the monitoring had been relayed to the prosecutors, but maintained that none of the evidence against the defendant had been derived from the surveillance, and that nothing was learned "which had any effect upon the presentation of the government's case or the fairness of petitioner's trial." Memorandum for United States in *Black* v. *United States, supra,* at 4. In *O'Brien* the Government stated that the only

---

[5] There is no evidence in this record that Weatherford's life would have been jeopardized or any ongoing investigations compromised had Weatherford given up his cover on March 20, 1970, after the crime was committed, rather than on July 27, 1970, after trial began. To the contrary, the fact that Weatherford felt no need for police protection after trial, App. 107, suggests that there was no danger at any time. And the Chief of the South Carolina State Law Enforcement Division conceded that Weatherford was not working on "anything particular" between the time of the crime and the time of the trial. *Id.,* at 125. Indeed the Chief admitted that he "wasn't concerned" about losing Weatherford's cover because after breaking the case "his identity is going to be known anyway." *Id.,* at 124. Thus the only legitimate justification the State had for arresting and indicting Weatherford, and for retaining a lawyer and manufacturing a story for him was to postpone for several months the date at which a new agent would have to be assigned again.

intercepted lawyer-client conversation concerned the terms of the defendant's bail, and that neither this conversation nor any other conversation was disclosed to the prosecuting attorneys. Brief for United States in *O'Brien* v. *United States, supra,* at 11. In both cases, the United States urged a remand for a hearing to determine whether the intrusions had tainted the trials. Memorandum for United States in *Black* v. *United States, supra,* at 5; Brief for United States in *O'Brien* v. *United States, supra,* at 12. Yet in each case this Court rejected that course and instead remanded for a new trial. To say that these cases establish that "when conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial," *ante,* at 552, twists the cases beyond recognition.[6] That is precisely the principle that was urged by the Government and by the dissenters, *Black* v. *United States, supra,* at 30–31 (Harlan, J., dissenting); *O'Brien* v. *United States, supra,* at 346–347 (Harlan, J., dissenting), but was rejected by the Court. By vacating the convictions *without* proof that "the

---

[6] The Court's alternative suggestion, *ante,* at 551–552, that *Black* and *O'Brien* were actually Fourth Amendment cases is equally unpersuasive. The briefs in *Black,* while noting the Fourth Amendment issue, Memorandum for United States 4; Supplemental Memorandum for Petitioner 6, focused on the Sixth Amendment violation, Memorandum for United States 3–4; Supplemental Memorandum for Petitioner 7–20. The opinion does not mention either the Fourth or Sixth Amendment, but the narration of the facts makes clear that the Court's primary concern was the interception of lawyer-client conversations. 385 U. S., at 27–28. Moreover, during the same Term that *Black* and *O'Brien* were decided, the Court, in another electronic surveillance case, remanded for a taint hearing rather than for a new trial because, "[u]nlike the situations in *Black* . . . and *O'Brien* . . . there was apparently no direct intrusion here into attorney-client discussions." *Hoffa* v. *United States,* 387 U. S. 231, 233 (1967). See also *Wolff* v. *McDonnell,* 418 U. S. 539, 576 (1974) (WHITE, J.) (citing *Black* and *O'Brien* as Sixth Amendment cases); *Hoffa* v. *United States,* 385 U. S. 293, 307 (1966) (citing *Black* as Sixth Amendment case).

overheard conversations have produced ... any of the evidence offered at trial," *Black* and *O'Brien* establish that "any governmental activity of the kind here in question *automatically* vitiates ... any conviction occurring during the span of such activity," *Black* v.. *United States, supra,* at 31 (Harlan, J., dissenting), and precludes the use of tainted evidence at any retrial.

Rather than retreating from *Black* and *O'Brien,* I would reaffirm them and would affirm the judgment of the Court of Appeals.